## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**

    **Plaintiff,**

**v.**                                                                                       Case No. 07-20039-JWL

**LUIS ALFREDO NANEZ-LOPEZ,**

    **Defendant.**

### MEMORANDUM AND ORDER

The indictment in this case charges the defendant Luis Alfredo Nanez-Lopez with one count of possession with intent to distribute methamphetamine and one count of possession with intent to distribute cocaine. This matter is before the court on Mr. Nanez-Lopez's motion to suppress (doc. #15) which challenges the validity of a traffic stop conducted by Basehor, Kansas Police Officers on March 3, 2007. Mr. Nanez-Lopez argues that both the initial stop and the eventual search of his vehicle violated his rights under the Fourth Amendment. The court held an evidentiary hearing on the motion at which both the government and the defendant presented witnesses. After thoroughly considering the parties' arguments and the evidence, the court will deny the motion.

**I.    Findings of Fact**

On March 3, 2007, Basehor Police Officers Michael Joslyn and Thomas Wiles responded

to a suspicious person report at the Casey's General Store located at the intersection of 155th and State Streets in Basehor, Kansas. Officer Wiles arrived at Casey's just before 5:04 a.m. and Officer Joslyn arrived just after him. Both Officer Wiles and Officer Joslyn testified that they observed a red vehicle, later determined to be driven by Mr. Nanez-Lopez, exit the south entrance of the Casey's parking lot and proceed to make an illegal left hand turn onto 155th Street, in violation of a posted "no left turn" sign. Judith Kay Bell, an employee of Casey's who was working that morning, testified that she observed Mr. Nanez-Lopez exit the parking lot through the north entrance and turn left onto 155th Street. Mr. Nanez-Lopez also testified that he exited through the north entrance. There is not a "no left turn" sign posted at the north entrance.

After exiting the parking lot, Mr. Nanez-Lopez proceeded south on 155th Street and turned left, heading east, onto State Street. Officer Wiles, Officer Joslyn, and Ms. Bell testified that they observed Mr. Nanez-Lopez make that left turn and that he did so when the traffic light was red. Officer Wiles and Ms. Bell were in the Casey's parking lot when they made that observation, which was about 250 to 300 feet away from the traffic light. Officer Joslyn, however, was following Mr. Nanez-Lopez by this time and was in close proximity to Mr. Nanez-Lopez's vehicle when he observed the turn. Mr. Nanez-Lopez testified that when he made the left turn, the traffic light was green as he approached the intersection and turned yellow as he proceeded through the intersection.

After Officer Joslyn observed Mr. Nanez-Lopez make the left turn, he activated the lights on his patrol car, signaling for Mr. Nanez-Lopez to pull over and shortly thereafter, Mr. Nanez-

Lopez pulled the vehicle over. By this time, Officer Wiles was in his patrol car following Officer Joslyn and he also pulled over. The two officers approached the vehicle together; Officer Wiles was on the passenger side and Officer Joslyn was on the driver's side. Officer Joslyn made contact with Mr. Nanez-Lopez by identifying himself and telling him that he had been pulled over for making an illegal left turn onto 155th Street and for turning left against the red light onto State Street. Officer Joslyn then asked for a license, registration, and insurance. Mr. Nanez-Lopez produced a Honduras driver's license and a resident alien card. Officer Joslyn testified that to legally operate a motor vehicle in Kansas, an individual must have a state issued or international driver's license. Officer Joslyn testified that Mr. Nanez-Lopez told him he did not know about any insurance; Officer Joslyn also testified that Mr. Nanez-Lopez did not look in the glove compartment for insurance information. Officer Joslyn further testified that he could smell the odor of alcohol coming from the driver's side.

Officer Joslyn then asked Mr. Nanez-Lopez to step out of the car and proceed to the rear of the vehicle, and Mr. Nanez-Lopez complied. By this time, Officer Wiles had moved to the rear of the vehicle as well. Officer Wiles asked Mr. Nanez-Lopez if he could conduct a patdown for officer safety and Mr. Nanez-Lopez consented. Just as Officer Wiles was about to conduct the patdown, Officer Joslyn instructed him to arrest Mr. Nanez-Lopez because he had no driver's license and no proof of insurance. Officer Wiles then conducted the patdown and discovered $2,245 in United States currency. Subsequently, Mr. Nanez-Lopez was handcuffed and placed in the backseat of Officer Joslyn's patrol car. Meanwhile, Officer Joslyn conducted a search of the vehicle and found a shoe box containing substances which were later identified as cocaine

and methamphetamine. Because of the windy conditions that day, the officers then decided to have the vehicle towed to another location so that a full search could be conducted. Thereafter, the vehicle was towed to Heartland Tow and a full inventory search was conducted.

At some point, Officer Wiles ran the license plate number of the vehicle through the computer and discovered that it was registered to Tom Wilson of Blue Springs, Missouri. Mr. Nanez-Lopez testified at the hearing that he had borrowed the car from a friend, Armando Garcia, of Kansas City, Missouri, because his own car had broken down. He testified that Mr. Garcia told him he had purchased the vehicle, but Mr. Nanez-Lopez did not know where Mr. Garcia had purchased it. Mr. Nanez-Lopez further testified that he did not have insurance on the vehicle or registration papers and that he did not know Tom Wilson.

**II.    Analysis**

Mr. Nanez-Lopez argues that the initial stop was illegal because he did not make an illegal left hand turn onto 155th Street and he did not run a red light when turning left onto State Street. Mr. Nanez-Lopez also argues that the subsequent search of the vehicle violated his Fourth Amendment rights. The Government, on the other hand, argues that Mr. Nanez-Lopez's motion should be denied because he lacks standing, or, alternatively, because the initial stop and subsequent search were valid under the Fourth Amendment.

*A.    Standing*

The Government first argues that Mr. Nanez-Lopez lacks standing to object to the search of the vehicle. The court declines to address the standing issue, however, because it concludes that no Fourth Amendment violation occurred in this case. *See, e.g.*, *United States v. Orrendain*,

188 F.3d 520, 1999 WL 518868, at *3 n.1 (10th Cir. 1999)("Because we find no Fourth Amendment violation even assuming [the defendant] has standing to challenge the search of the truck, we decline to address the standing issue."); *United States v. Perez*, 145 F.3d 1247, 1998 WL 188320, at *1 n.1 (10th Cir. 1998)("This court need not address the government's argument that Defendant has no standing to challenge the searches because we find that, even assuming Defendant does have standing, the search warrants were valid."). *United States v. Scarborough*, 128 F.3d 1373, 1378 n.2 (10th Cir. 1997)("We need not address [the standing] issue because we find that, even assuming that defendant does have standing, it is clear that there was no constitutional violation . . . ."). Thus, the court assumes, without deciding, that Mr. Nanez-Lopez has standing to challenge the initial stop and search of the vehicle.

B.     *The Traffic Stop*

Mr. Nanez-Lopez first argues that Officer Joslyn lacked justification for the initial traffic stop. The Fourth Amendment prohibits unreasonable searches and seizures by the Government. U.S. Const. amend. IV. "Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)." *Id.* "The first inquiry under *Terry* is whether the stop was justified at its inception." *Williams*, 403 F.3d at 1206 (citing *United States v. Botera-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)). "The second *Terry* inquiry is whether the officer's conduct during detention was reasonably related in scope to the circumstances which justified the initial

stop." *Id*. (citing *Terry*, 392 U.S. at 20).

In order to satisfy the reasonableness requirement of the Fourth Amendment, the traffic stop "'must be based on an observed traffic violation' or a 'reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" *United States v. Cline*, 349 F.3d 1276, 1286 (10th Cir. 2004)(quoting *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001))(further citations omitted). "'When evaluating the reasonableness of the initial stop of a vehicle, our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005)(quoting *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003).

The court notes that there was conflicting testimony presented at the hearing as to whether Mr. Nanez-Lopez had exited out of the south Casey's entrance and turned left in violation of a posted no left turn sign, or whether he had exited out of the north Casey's entrance and turned left where there was no such sign. The court need not resolve this conflict, however, because it determines that regardless of whether the officers were justified in stopping Mr. Nanez-Lopez for the alleged illegal left turn onto 155th Street, they were justified in stopping him for running a red light when he turned left onto State Street. Ms. Bell and Officer Wiles both testified that they saw Mr. Nanez-Lopez turn left onto State Street against a red traffic light. The court notes, however, that they made their observations from the Casey's parking lot, which was approximately 250 to 300 feet away from the traffic light. Officer Joslyn, on the other hand, testified that he was following Mr. Nanez-Lopez in close proximity when he observed Mr.

Nanez-Lopez run the red light, so his testimony concerning the red light is more reliable.

Mr. Nanez-Lopez is the only person who testified that the light was not red when he turned left through the intersection. The court notes that, even if it credits Mr. Nanez-Lopez's testimony that the light was actually yellow, the traffic stop would still be justified because Officer Joslyn need only have a reasonable suspicion that a traffic law had been violated in order to validate the traffic stop. Therefore, based on Officer Joslyn's credible testimony presented at the hearing that he saw Mr. Nanez-Lopez turn left when the traffic light was red, the court concludes that the initial stop of Mr. Nanez-Lopez was valid because Officer Joslyn had a reasonable, articulable suspicion that Mr. Nanez-Lopez had run a red light, in violation of Kansas law.[1]

The court further concludes that the officers' conduct during the detention was reasonably related in scope to the traffic stop and Mr. Nanez-Lopez does not argue to the contrary. "During a routine traffic stop a police officer may ask questions, request and examine a driver's license and vehicle documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle." *United States v. Solorio*, 78 F. App'x 696, 699 (10th Cir. 2003)(citing *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997)). Officer Joslyn asked for Mr. Nanez-Lopez's license, registration, and proof of

---

[1] The government filed a motion(doc. 20) to supplement the record with a videotape of the stop which it contends shows unequivocally that the traffic light was red when Mr. Nanez-Lopez turned left onto State Street; the defendant opposes this motion. The court denies the motion to supplement because the government has not shown good cause as to why the tape was not located sooner. The court's decision concerning the traffic light is based solely on the testimony presented at the hearing.

insurance, which is clearly within the parameters of the Fourth Amendment's reasonableness requirement. *See id.* Accordingly, the court concludes that the traffic stop did not violate Mr. Nanez-Lopez's constitutional rights. Furthermore, Mr. Nanez-Lopez does not challenge the validity of his arrest for failure to produce a valid driver's license and proof of insurance; therefore, the court does not address that issue.

C.      *Search of the Vehicle*

Mr. Nanez-Lopez does, however, argue that the search of his vehicle conducted by Officer Joslyn violated his constitutional rights.[2] Typically, warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement. *United States v. Karo*, 468 U.S. 705, 717 (1984). One of those specific exceptions is an inventory search, which "'[is] now a well-defined exception to the warrant requirement of the Fourth Amendment.'" *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003)(quoting *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)).

"'It is common practice for the police to conduct an inventory search of the contents of vehicles that they have taken into their custody or are about to impound.'" *Tueller*, 349 F.3d at

---

[2]Mr. Nanez-Lopez does not argue that the impoundment of the vehicle was illegal. Nevertheless, the court notes that the officers' impoundment of the vehicle and transportation to Heartland Tow was valid under Kansas law, which provides that a police officer may cause a vehicle found on the highway to be removed to a place of safety when "the person driving or in control of such vehicle is arrested for an alleged offense . . ." K.S.A. § 8-1570(c)(3). Moreover, the impoundment was reasonable because Mr. Nanez-Lopez could not prove ownership or proof of registration, and the record indicates that no other person was available to take immediate custody of the car; therefore, the car had to be impounded out of necessity. *See United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997)(holding that impoundment was legal under Utah law and reasonable because defendant could not provide proof of ownership or registration and there was no one else available to take immediate custody of the car under the circumstances).

1243(quoting Wayne R. LaFave, *Search and Seizure* § 7.4 at 536 (3d ed. 1996 & Supp. 2003)). Inventory searches serve three administrative purposes: "'the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.'" *Id.* (quoting *South Dakota v. Opperman*, 429 U.S. 364, 369 (1976)). An inventory search is reasonable, however, only if conducted according to standardized procedures. *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). Here, no evidence was produced regarding whether the initial search of the vehicle by the side of the road actually complied with Basehor police procedures. Thus, the court cannot determine whether that search was a valid inventory search.

Nevertheless, the court concludes that the inevitable discovery doctrine applies in this case. The Supreme Court recognizes the inevitable discovery exception to the warrant requirement, which applies when the evidence allegedly unlawfully obtained "ultimately or inevitably would have been discovered by lawful means." *Tueller*, 349 F.3d at 1243. An inventory search is one such "lawful means." *Id.*; *see also*, *United States v. Haro-Salcedo*, 107 F.3d 769, 773-74 (10th Cir. 1997)("This court has affirmed the inevitable discovery doctrine in the context of an illegal search which preceded lawful impoundment and inventory."); *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992)("[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible.").

Even if the initial search of the vehicle by the side of the road was not a valid inventory

search, the court concludes that the evidence found in the shoe box would have been inevitably discovered pursuant to a subsequent inventory search conducted after the vehicle was impounded. Here, as noted above, the police officers lawfully impounded Mr. Nanez-Lopez's vehicle after his arrest. Thereafter, they were fully justified in conducting a full inventory search of the vehicle and the shoe box containing the drugs would have been discovered.[3] *See United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992)("Even assuming arguendo that the post-arrest search beside the highway was improper and should have been conducted in a different manner, had the search been conducted in the manner defendant suggests is proper, it was inevitable that the weapons would have been discovered . . . ."). *See also Haro-Salcedo*, 107 F.3d at 773 (holding that inevitable discovery doctrine precluded suppression of evidence found in defendant's vehicle where vehicle was lawfully impounded after arrest and a proper inventory search would have uncovered the evidence in the trunk of his vehicle). Therefore, because the evidence would have been discovered pursuant to a full inventory search after the vehicle was lawfully impounded, the court denies Mr. Nanez-Lopez's motion.

---

[3] Mr. Nanez-Lopez does not argue that opening the shoe box violated police department procedures. *See United States v. Sandoval*, 161 F.3d 19, 1998 WL 637260, at *3 (10th Cir. 1998)("Police officers may search closed containers in an impounded vehicle pursuant to sufficiently regulated inventory procedures.").

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress evidence (doc. 15) is denied and the government's motion to supplement (doc. 20) is denied.

**IT IS SO ORDERED.**

Dated this 6th day of August, 2007.

s/ John W. Lungstrum<br>
John W. Lungstrum<br>
United States District Judge